IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-01636-RM-STV

COREY MCNELLIS,

      Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT,

      Defendant.

---

## MOTION TO DISMISS FIRST AMENDED COMPLAINT

---

      Defendant Douglas County School District (the "School District") moves to dismiss Plaintiff's First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

### CONFERRAL

      Undersigned counsel conferred with Plaintiff's counsel regarding the arguments in this motion. Plaintiff opposes the motion.

### INTRODUCTION

      This is an employment case concerning the School District's termination of Plaintiff Corey McNellis ("McNellis"), a former high school administrator. McNellis asserts a § 1983 claim against the School District for First Amendment free speech retaliation. Claiming he was terminated because of his Christian religion, McNellis also asserts Title VII and Colorado Anti-Discrimination Act ("CADA") discrimination and retaliation claims against the School District. However, as explained below, the allegations in McNellis' First Amended complaint fail to state a claim upon which relief can be granted.

## LEGAL STANDARD

As the Court noted in *Citizens for Const. Integrity v. United States*, 2021 WL 4241336, at

*1 (D. Colo. Aug. 30, 2021) (unpublished):

> In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014); *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). The complaint must allege a "plausible" right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007); *see also id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Conclusory allegations are insufficient, *Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation omitted).

## RELEVANT FACTUAL ALLEGATIONS

The School District is a Colorado public school district. First Am. Compl. (Doc. 24, the "Complaint"), ¶ 4. It is governed by a Board of Education ("Board"). *Id.* at ¶ 5.

Pursuant to Board Policy CBA/CBC, the Board has delegated day-to-day School District operations to the District's Superintendent; however, it has specifically retained the right to make employment decisions, stating in the Policy that the Superintendent shall only make recommendations to the Board in that regard. Ex. A ("The Superintendent shall: … Recommend to the Board personnel selection, employment, assignment, transfer, and suspension").[1]

---

[1] The Court may take judicial notice of public documents, such as School District policies, without converting the motion to one for summary judgment. *Shifrin v. Colorado,* 2010 WL 2943348, *5 (10th Cir. 2010), *citing Van Woudenbert ex rel Foor v. Gibson,* 211 F.3d 560, 568 (10th Cir. 2006).

McNellis worked at the School District's Ponderosa High School ("Ponderosa"). *Id.* at ¶ 17. During the 2020/21 school year, he was employed as an Assistant Principal and Athletic Director. *Id.* at ¶¶ 37, 39. McNellis' child also attended Ponderosa that year. *Id.* at ¶ 47.

Among McNellis' job duties was to "coordinate effective communications strategies among the students, the community, the faculty and the administration." Ex. B, Assistant Principal/Athletic Director – High School Job Description.[2] "McNellis was part of [Ponderosa's] Administrative Team, which would discuss some aspects of extracurricular activities." Complaint, ¶ 40. The Administrative Team, which consisted of Ponderosa Principal Tim Ottmann and the Assistant Principals, met privately once a week to discuss extracurricular activities. *Id.* at ¶¶ 41–43. "The Administrative Team was not responsible for determining the content of the school plays that were produced by the theater department." *Id.* at ¶ 44. McNellis was "the Fellowship of Christian Athletes ("FCA") point person for Ponderosa" for twelve years preceding his termination, a position the School District knew he held. *Id.* at ¶¶ 48-49.

On October 2, 2020, Ponderosa Theater Director Kayla Diaz ("Diaz") "sent a group email to the entire Ponderosa staff including McNellis regarding the content of a planned school play." *Id.* at ¶ 50. Diaz had not discussed the play with the Administrative Team prior to "sending an email to the entire Ponderosa staff soliciting feedback." *Id.* at ¶¶ 51–52. Diaz "informed all staff members that Ponderosa's Theatre Company would be performing *The Laramie Project* on October 23-24, 2020." *Id.* at ¶ 53. According to McNellis, *The Laramie Project* "is a religiously charged play that covers distressing material. The play depicts the aftermath of the 1998 murder

---

[2] The Court may take judicial notice of public documents, such as School District employee job descriptions, without converting the motion to one for summary judgment. *Shifrin,* 2010 WL 2943348 at * 5.

of Matthew Shepard in Laramie, Wyoming. The murder is widely acknowledged to have been a hate crime motivated by Shepard's sexuality. The play consists of a series of interviews from members of the Laramie community. Several of the characters interviewed are Christian leaders, some of whom share unsavory opinions regarding Shepard's murder, and cite their Christian faith as the reason for their views." *Id.* at ¶¶ 54-55.

Diaz's email warned that it was "not a family-friendly show," but "generally [recommended for] high school age and up" and that "it [was] important that [she could] answer any question [the staff] may have and that [the staff was] aware of the nature of the play so that if we have students who have an aggressively adverse reaction to our show choice that [the staff] can support us in helping students understand. … We would not want anyone in the school to believe we are making a statement against anything other than hate and violence." *Id.* at ¶¶ 56-57.

McNellis responded with an email to the entire Ponderosa staff: "Thanks Kayla, I appreciate the email and I really do admire the hard work that you do. As a Dad of a student here and also an employee in the school, what is my recourse if I disagree with the production? Was this a heads up to see if everyone is cool?" *Id.* at ¶ 59. Other staff members also responded to Diaz's email, with one "acknowledging the difficulty of the subject matter and offering to help by providing a 'Social Studies perspective'" and another indicating that "not everyone has to agree with every ideology that exists, but it is the discourse that is invoked that matters." *Id.* at ¶¶ 62-63.

The Amended Complaint alleges that McNellis subsequently "responded to the emails from the other staff and offered to provide a Christian perspective." *Id.* at ¶ 64. Those "responses" consisted of three additional emails to the entire Ponderosa staff: (i) at 9:37 p.m., McNellis wrote "As a christian [sic] I would love to collaborate with your project. Please let me know if the love

that Jesus can provide will help your play"; (ii) at 9:52 p.m., he wrote "For the record, all of administration does not agree with me on this. I am totally solo. Good night Mustangs!"; and (iii) at 10:27 a.m. on October 3, 2021, he wrote "I understand people support this. Forgive me for having a different viewpoint and the audacity to publicly share it." Ex. C.[3] McNellis sent the emails using his School District email address and used a signature identifying himself as the Ponderosa "Athletic Director/Assistant Principal." *Id.*

The emails were shared with School District Human Resources Director Cathy Franklin ("Franklin"), School District Director of Schools Daniel Winsor ("Winsor"), and Ponderosa Principal Tim Ottmann ("Ottmann"). Complaint, ¶ 66. On Saturday, October 5, 2021, Winsor instructed McNellis to stay home the following Monday and, when McNellis asked why, told McNellis it was "because of his 'religious comments.'" *Id.* at ¶¶ 67, 69-70. "McNellis questioned Defendant's decision to have him stay home because he believed he was being treated differently based on the 'religious comments.'" *Id.* at ¶ 71. Three days later, Franklin, Winsor, and Ottmann convened a meeting with McNellis to inform him that he was being placed on leave and that they "would be conducting further investigation regarding Mr. McNellis' email related to The Laramie Project." *Id.* at ¶¶ 77, 79–81, and 91. This despite that the School District and Franklin "already possessed all the emails related to Mr. McNellis' email related to The Laramie Project." *Id.* at ¶ 92. "Mr. McNellis objected to Defendant's conduct during the Meeting because he did not feel comfortable with the way the meeting went because the Defendant was going to suspend him and investigate him for the 'religious comments.'" *Id.* at. ¶ 83. "Upon information and belief, David

_____

[3] The Complaint refers to McNellis' emails. *E.g.*, ¶¶ 59 and 64-65 A defendant may submit an indisputably authentic copy of a document referred to in a plaintiff's complaint with a motion to dismiss without converting the motion to one for summary judgment. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-84 (10th Cir. 1997).

Ray, the Chairman of the Board of Education for [the District], was aware of Defendant's investigation into Mr. McNellis" and also "knew of email complaints against Mr. McNellis that were related to his emails in response to the Laramie Project." *Id.* at ¶¶ 85–86. "While on leave, Mr. McNellis complained to Principal Ottmann that he was being investigated based on his Christian beliefs." *Id.* at ¶ 95. He also complained to several coworkers. *Id.* at ¶ 96.

During the investigation, the School District and Franklin "received a complaint from a teacher claiming that Mr. McNellis was part of a good ole boys club" that included "numerous other male teachers, and administrators including Principal Ottmann, Jarod Nicholson, and Joseph Schubarth." *Id.* at ¶ 101. But none of the other alleged "good ole boys club" members were "investigated, placed on leave, or otherwise disciplined" based on those allegations. *Id.* at ¶ 102. In addition, the investigation "uncovered a single email indicating that Mr. McNellis had complained 'as a parent' about Ponderosa's communications regarding its COVID safety protocols." *Id.* at ¶ 106. However, other "faculty and administrators" had the same complaints, and none of them were "investigated, placed on leave, or otherwise disciplined." *Id.* at ¶¶ 107 - 108.

"On October 29, [2021] … Defendants terminated Mr. McNellis' employment." *Id.* at ¶ 113. McNellis' emails regarding *The Laramie Project* were directly cited as the reason for his termination. *Id.* at ¶ 114. After McNellis was terminated and after Ottmann retired as Ponderosa's principal, Ottmann wrote a letter to the District in which he asserted his "perspective about what happened to [McNellis]," stating that although he was not the decisionmaker regarding McNellis' termination, he believed McNellis' religious views played a role. *See* Ex. D ("it wasn't my decision

to make").[4]

**ARGUMENT**

I.   <u>§ 1983 First Amendment Retaliation claim (Claim 5).</u>

District courts evaluate a public employee's First Amendment claim under the five-prong *Garcetti/Pickering* test. *Roberts v. Winder*, 16 F.4th 1367, 1381 (10th Cir. 2021). There, a court must determine whether (1) the speech was made pursuant to an employee's official duties; (2) the speech was on a matter of public concern; (3) the government's interests as an employer in promoting efficient public service outweigh a plaintiff's free speech interests; (4) the speech was a motivating factor in the adverse employment action; and (5) the same employment decision would have been made without the protected speech. *Id.*

i.   McNellis failed to plead sufficient facts to allege that his speech was *not* made pursuant to his official duties.

A public employee's speech made pursuant to his official duties does not enjoy the protection of the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). The plaintiff carries the burden to establish that the contested speech was not made pursuant to official duties. *Casey v. W. Las Vegas Ind. Sch. Dist.* 473 F.3d 1323, 1328 (10th Cir. 2007). The Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). It takes "a practical view of all the facts and circumstances surrounding the speech and the employment relationship, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.*; *Brammer-*

---

[4] The complaint refers to Ottmann's letter and thus it may be considered without converting this motion to one for summary judgment. *See GFF Corp.*, 130 F.3d at 1384-84.

7

*Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007). "Speech is made pursuant to official duties if it is generally consistent with the type of activities an employee was paid to do." *Id.* at 1203.

Here, McNellis admitted in the emails he sent about *The Laramie Project* that he was speaking as a public employee. *See* Complaint, ¶ 59 ("As a Dad of a student here and also an employee in the school…"). Despite this straightforward admission, McNellis apparently contends that his speech is not foreclosed from protection by *Garcetti* because he was simultaneously speaking as a parent of a Ponderosa student. However, the Supreme Court's well-known basic rule is "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. McNellis' admission that he was speaking as a public employee means that—notwithstanding his characterization of his speech—he was not speaking as a citizen. *See id.* McNellis' conclusory allegations that he was speaking "in his capacity of a father" and other similar statements are insufficient to show that he was speaking as a private citizen. *See Twombly*, 550 U.S. at 555 (quotation omitted). The conclusory allegation is particularly insufficient when it strikes against McNellis' own admission that he was speaking as a School District employee.

In any event, "the practical view of the facts and circumstances surrounding the speech" the Tenth Circuit prescribes confirms that McNellis was speaking as an employee. *See Rohrbough*, 596 F.3d at 746; *Brammer-Hoelter*, 492 F.3d at 1204. Even though the speech at issue need not be encapsulated in an employee's job description to be considered pursuant to the employee's official duties, *Brammer-Hoelter*, 492 F.3d at 1203, McNellis' job description did just that: he was

responsible for "[coordinating] effective communications strategies among the students, the community, the faculty and the administration." McNellis' communications concerning *The Laramie Project* fall squarely within that duty. Moreover, McNellis was using his School District email address through the School District email system to simultaneously email a captive audience of the entire Ponderosa staff about a School District program conducted at a school in which he was an administrator, signing the emails as the Ponderosa Athletic Director/Assistant Principal. *See, e.g., Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York*, 593 F.3d 196, 204 (2nd Cir. 2010) (speech through channels only available to those working in the school not made as citizen).

Furthermore, McNellis admits that part of his job duties involved meeting "once a week to discuss any issues that may arise with respect to extracurricular activities." Am. Compl., ¶ 42. Although he states that the Administrative Team did not hold such discussion in a "public forum or with the entire staff at Ponderosa," he does not allege that he was prohibited from doing so. Nor does his statement that "all administration does not agree with [him]" insulate him from a finding that he was speaking pursuant to his official duties. To the contrary, the facts and circumstances of the speech at issue confirm that its protection is foreclosed by *Garcetti* and its progeny. This requires dismissal of the First Amendment claim.

      ii.        McNellis failed to plead sufficient facts to allege that his speech was a matter of public concern.

Finally, McNellis' speech about a district-sanctioned play is not protected activity because it does not amount to speech about a matter of public concern. Matters of public concern are those that "can be fairly considered as relating to any matter of political, social, or other concern to the community." *Withiam v. Baptist Health Care of Okla.,* 98 F.3d 581, 583 (10th Cir. 1996). "It is

not enough that its subject matter could in [certain] circumstances, [be] the topic of a communication to the public that might be of general interest. What is actually said on that topic must itself be of public concern." *Wilson v. City of Littleton, Co.,* 732 F.2d 765, 768 (10th Cir. 1984). An employee's personal feeling on a matter that could be of general interest to the public is not a matter of public concern under the First Amendment. *Id.* Although the school play could generally have been of interest to the public, McNellis' personal feelings about it are not matters of public concern sufficient to give rise to First Amendment protection. Moreover, courts have held that internal speech by school employees consisting of disputes over school play productions and other curricular/administrative matters does not amount to a matter of public concern. *See, e.g., Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 368-69 (4th Cir. 1998); *Finch v. Fort Bend Ind. Sch. Dist.*, 333 F.3d 555, 563-64 (5th Cir. 2003). McNellis' First Amendment claim must also be dismissed for this reason.

iii.      McNellis failed to allege his speech was a motivating factor in any decision by the School District's Board of Education, the only entity who can bind the School District to liability under § 1983.

A municipality cannot be held liable for the actions of its employees pursuant to § 1983 under a theory of *respondeat superior*. *Marshall v. Columbia Lea Reg. Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003) (citation omitted). Instead, a plaintiff must show that the unconstitutional actions of an employee were (1) carried out by an official with final policy making authority with respect to the challenged action or (2) representative of an official policy or custom of the municipal institution. *Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1249 (10th Cir. 1999). These principles apply to school districts, which are "municipalities" for purposes of § 1983. *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 733 (1989). In identifying final municipal policymakers,

the courts must examine state laws and local ordinances or regulations to determine where the statutory law places the responsibility for making law or setting policy in a particular area. *Ledbetter v. City of Topeka, Kan.*, 318 F.3d 1183, 1189 (10th Cir. 2003).

To sustain liability against the District, McNellis must prove that the allegedly unconstitutional actions were enacted pursuant to an official custom or policy of the District or an action carried out by a final policymaker for the District. *See Murrell*, 186 F.3d at 1249; *Marshall*, 345 F.3d at 1177. The only delegation of final policymaking authority that can impose liability on the District is legal delegation. *Milligan-Hitt v. Bd. of Trustees, Sheridan Cty., Sch. Dist. No. 2*, 523 F.3d 1219, 1230 (10th Cir. 2008). Colorado law provides that a school district's board of education has the final policymaking authority to "employ all personnel required to maintain the operations and carry out the education program of the district…." Section 22-32-109(1)(f)(I), C.R.S.

McNellis alleges in paragraphs 8 – 11 of the Amended Complaint that the Board delegated its "powers and duties to the Superintendent and administrative team of DCSD" and to "DCSD's employees," including "Ponderosa Principal (Tim Ottmann), DCSD Human Resources Director (Cathy Franklin), and DCSD Director of Schools (Daniel Winsor)." However, legally only the Board has policymaking authority for the District with respect to employment decisions. *See* Section 22-32-109(1)(f)(I), C.R.S.; Ex. A. While McNellis seems to be attempting to argue that the Board *effectively* delegated its decision-making with respect to his employment to the named administrators, *Milligan-Hitt* teaches that this is not sufficient to endow them with policymaking authority. 523 F.3d at 1230. The Board has not legally delegated its decision-making authority with respect to employment to anyone; it could only do so by "legal" action, e.g., adopting a policy.

*See Ledbetter*, 313 F.3d at 1189 (courts examine state laws and policies to determine who is a final policymaker for the purposes of § 1983 claims). Pursuant to Board Policy CBA/CBC, the Board has in fact *retained* its authority to review employment decisions by charging the Superintendent to make *recommendations* thereon. This ability to review is a hallmark of retaining policymaking authority for the purposes of § 1983. *See Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (individual is not a § 1983 final policymaker when decisions are subject to meaningful review). The Amended Complaint describes neither any scenario rising to the level of a custom or policy, nor any action at all by the Board.

Faced with the above authority, McNellis seems to attempt to salvage his claim by alleging that one Board Member, David Ray, knew about McNellis' *Laramie Project* emails and the ensuing investigation, but it does not allege that Ray shared that information with other Board members, developed any retaliatory animus because of that knowledge, or that that knowledge led the Board in any way to retaliate against McNellis. Even assuming Director Ray harbored the requisite knowledge and retaliatory animus, it alone would be insufficient to support a claim for municipal liability against a governing board that acts as a group. *See Fortner v. County of El Paso,* 2015 WL 10384289, *13 (D. Colo. 2015) (a single board member's actions cannot bind a multimember board) (unpublished). This precludes McNellis from establishing that his speech was a motivating factor in the employment decision by those who could bind the School District for the purposes of § 1983. *See Bunch v. Ind. Sch. Dist. No. I-050, Osage Cnty.*, 435 Fed. Appx. 784, 789 (10th Cir. 2011) (unpublished), *citing Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008) ("[A plaintiff] must come forward with evidence from which a reasonable

factfinder could conclude that those who decided to fire him had knowledge of his protected activity."). This presents an additional basis for dismissal of this claim against the School District.

    II.  <u>Title VII and CADA Discrimination (Claims 1 and 3) – McNellis failed to allege he was terminated under circumstances giving rise to an inference of discrimination.</u>

The substantive analysis for discrimination claims under CADA is identical for discrimination claims under Title VII. *See Agassounon v. Jeppesen Sanderson, Inc.*, 688 Fed. Appx. 507, 509 (10th Cir. 2017) (unpublished); *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1115 n. 2 (D. Colo. 2021). To establish a prima facie case of discrimination, a plaintiff must demonstrate that (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination. *Barlow v. C.R. England, Inc.*, 703 F.3d 497, 505 (10th Cir. 2012). To establish the third element, McNellis attempts to proceed by alleging preferential treatment given to other employees. *See id.*

However, McNellis fails to allege sufficient facts to satisfy the pleading standard *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) set for this type of case:

> A plaintiff must include enough context and detail to link the allegedly adverse employment action to a discriminatory or retaliatory motive with something besides sheer speculation. A plaintiff should have—and must plead—at least some relevant information to make the claims plausible on their face. Thus, it is insufficient for a plaintiff to allege, for instance, that she did not receive an employment benefit that "similarly situated" employees received. A plaintiff's assertion that she is "similarly situated" to other employees is just a legal conclusion—and a legal conclusion is never enough. Rather, a plaintiff must allege some set of facts—not just legal conclusions—that taken together plausibly suggest differential treatment of similarly situated employees. Pleadings that do not allow for at least a reasonable inference of the legally relevant facts are insufficient.

*Bekkem v. Wilkie*, 915 F.3d 1258, 1274-75 (10th Cir. 2019) (internal citations and quotations omitted).

Like the unsuccessful plaintiff in *Bekkem*, McNellis refers to "similarly situated employees" whom he believes were treated more favorably. Although he identifies three of them – Ottmann, Nicholson, and Schubarth – as those who were alleged to have been in a "good ole boys club" but were not disciplined, he does not allege any additional details showing that said employees do not share his protected class or that they were not terminated for doing the same acts as him. *See id.* at 1275. While McNellis also suggests that he and other employees engaged in complaints about COVID-19 protocols, yet only he was terminated for them, he does not identify the other employees or state whether they did not share his protected class. Without those additional details, McNellis' conclusory allegations that he was treated differently than others are "insufficient to indicate that … discrimination was the plausible, rather than just the possible reason" for his termination. *Id.*

Moreover, McNellis does not identify who he believes made the decision to terminate him and does not state whether they were motivated by anti-Christian animus. McNellis asserts that Ottmann admitted in a letter that the District discriminated against McNellis, but this assertion is unsupported by the letter itself. *See* Ex. D. In any event, Ottmann states that he was not the decisionmaker. *Id.* Moreover, McNellis makes no allegations connecting Ottmann's allegations to a decision-maker. McNellis seems to believe he states a claim by simply alleging he was terminated at least in part for writing emails in which he stated he was a Christian and mentioned Jesus. Not so. *See Allison v. Digital Mgmt. Inc.*, 2013 WL 5862647, **3-4 (D. Colo. Oct. 13, 2013) (unpublished).

III. <u>Title VII and CADA Retaliation (Claims 2 and 4) – McNellis failed to allege that his protected activity was the but-for cause of his termination.</u>

To state a prima facie case of Title VII or CADA retaliation,[5] the plaintiff must plausibly allege "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that the protected activity was the but-for cause of the employer's actions. *Allison,* 2013 WL 5862647, \*\*3-4, *citing Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012); *Deere v. XPO Logistics Freight, Inc.*, 2019 WL 699112, \*10 (D. Colo. Feb. 20, 2019) (Moore, J.) (unpublished) (as to third element). Only one of McNellis' allegations constitutes protected activity and it has no causal connection to McNellis' termination.

      i.        McNellis has alleged only one instance of protected activity.

McNellis suggests he engaged in protected opposition by stating he is a Christian and making religious comments about *The Laramie Project* (Complaint, Second Claim for Relief, ¶¶ 124-25 and 127); questioning the School District's decision to place him on leave "because he believed he was being treated differently based on the 'religious comments'" (*Id.* at ¶ 71); complaining to Ottmann that he was being investigated based on his Christian beliefs (*Id.* at ¶ 95); and making the same complaint to "coworkers" (*Id.* at ¶ 96).

"Opposition to an employer's conduct is protected" by Title VII "only if it is opposition to a 'practice made an unlawful employment practice by [Title VII].'" *Petersen v. Utah Dept. of Corrs.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *see also Trujillo v. Bd. of Educ. Of Alb. Pub. Sch.*, 2007 WL 2296903, \*8 (D.N.M. 2007) (employee's complaint alleging abuse of students was not

---

[5] CADA retaliation claims are likewise analyzed in the same manner as Title VII retaliation claims. *Agassounon*, 688 Fed.Appx at 509; *Barrington*, 566 F. Supp. 3d at 1115 n. 2.

protected activity under Title VII). Complaints that are not specific in nature are insufficient to

constitute protected activity under Title VII. *Dean v. Computer Sciences Corp.*, 384 F. App'x 831,

839 (10th Cir. 2010) (employee who alleged she was the only African American at the company,

described herself as a "single black mother," and complained she was being treated poorly did not

engage in protected activity under Title VII because she failed to link the alleged conduct to her

race); *Anderson v. Academy Sch. Dist. 20*, 122 Fed. Appx. 912, 916 (10th Cir. 2004) (employee

who characterized written complaint as harassment/discrimination complaint but failed to link

racial bias to misconduct does not constitute protected activity).

McNellis' status as a Christian and his *Laramie Project* emails are not protected activity

because they are not complaints about discriminatory employment practices. McNellis fails to

appreciate the distinction between retaliation and discrimination claims articulated by the Supreme

Court in *Burlington Northern and Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 63 (2006). Allegations

that an employee has been mistreated because of his protected class—rather than because the

employee has opposed discrimination against the employee or someone else or participated in an

investigation, proceeding, or hearing under Title VII—simply do not support a retaliation claim.

*Id.*; *see Vaughn v. Epworth Villa*, 537 F.3d 1147, 1151 (2008) (describing the two categories of

protected activity).

McNellis' vague statements that he "questioned Winsor's motive" and "questioned

Defendant's conduct" also do not constitute cognizable protected opposition because they do not

allege that McNellis articulated complaints of discrimination. Rather, the artful pleading of these

allegations indicates that they reflect McNellis' then-unstated feelings and beliefs. Nor is

McNellis' complaint to coworkers, who had no supervisory authority over him and did not relay

the complaint to supervisors, protected activity. *See Bullard v. Goodyear Tire & Rubber Co.,* 2011 WL 4092192 \*11 (D. Kan. 2011) (complaints to coworkers not protected activity). Thus, the only protected activity in which McNellis alleges he engaged was the complaint to Ottmann "that he was being investigated based on his Christian beliefs." Am. Compl., ¶ 95.

ii.      McNellis has not pled causal connection between his complaint to Ottmann and his termination.

To engage in unlawful retaliation, an alleged retaliator must at least know of an employee's protected activity. *See Petersen v. Utah Dep't of Corr.,* 301 F.3d 1182, 1188–89 (10th Cir. 2002). Here, Ottmann was not the decisionmaker. *See* Ex. D. Nor is there any allegation that Ottmann told anyone, much less the unnamed decisionmakers, about McNellis' complaint that he was being discriminated against. Because McNellis has failed to allege that any decisionmaker knew about his complaint, he has not adequately alleged the causation element and his retaliation claim is subject to dismissal. *See Petersen,* 301 F.3d at 1188-89.

Additionally, McNellis cannot prove any causal connection between his termination and any of the alleged protected activity following October 5, 2020, the date he was placed on leave to investigate his *Laramie Project* emails. Once McNellis was on leave, the School District knew that the results of the investigation could lead to discipline, undermining any argument that subsequent complaints led to his termination. *See Nixon v. City and County of Denver*, 784 F.3d 1364, 1370 (10th Cir. 2015) (proceeding on an avenue previously contemplated prior to protected activity is not evidence of causation). As a result, McNellis cannot prove a causal connection between the alleged protected activity and his termination.

## CONCLUSION

For the reasons stated above, the School District respectfully requests that this case be dismissed with prejudice.

RESPECTFULLY SUBMITTED this 11th day of October, 2022.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: *s/Mary B. Gray*
      Michael Brent Case
      Mary B. Gray
      Scott Goodstein
      1120 Lincoln Street, Suite 1308
      Denver, CO  80203
      (303) 595-0941
      bcase@semplelaw.com
      mgray@semplelaw.com
      sgoodstein@semplelaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of October, 2022, a correct copy of the foregoing **MOTION TO DISMISS** was filed and served via CM/ECF to the following:

Spencer J. Kontnik, #47447
Matthew Fenicle, # 57055
KONTNIK | COHEN, LLC
201 Steele Street, Suite 210
Denver, Colorado 80206
Telephone: (720) 449-8448
skontnik@kontnikcohen.com
mfenicle@kontnikcohen.com
*Attorneys for Plaintiff*

By: *s/  Kathleen Schmidt*