# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Senior Judge Raymond P. Moore

Civil Action No. 22-cv-01636-RM-STV

COREY MCNELLIS,

    Plaintiff,

v.

DOUGLAS COUNTY SCHOOL DISTRICT,

    Defendant.

---

## ORDER

---

This religious discrimination case is before the Court on Defendant's Motion for Summary Judgment (ECF No. 82), which has been fully briefed (ECF Nos. 94, 96) and is granted for the reasons below.

**I.    LEGAL STANDARD**

Summary judgment is appropriate only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018). Applying this standard requires viewing the facts in the light most favorable to the nonmoving party and resolving all factual disputes and reasonable inferences in his favor. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "The substantive law of the

case determines which facts are material." *United States v. Simmons*, 129 F.3d 1386, 1388 (10th Cir. 1997). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Id.* at 251-52; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).

Where the burden of persuasion at trial would be on the nonmoving party, the party moving for summary judgment bears the initial burden of showing an absence of any issues of material fact. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). If the moving party demonstrates that the nonmoving party's evidence is insufficient to establish an essential element of his claim, the burden shifts to him to set forth specific facts showing that there is a genuine issue for trial. *See id.* If he fails to make a sufficient showing to establish the existence of an element, summary judgment must be entered in favor of the moving party. *See id.*

## II.   BACKGROUND

The relevant facts are undisputed. Plaintiff is a Christian who began working for Defendant as a teacher in 2002. (ECF No. 97, ¶ 5.) He was promoted to the position of Athletic Director/Assistant Principal at Ponderosa High School in 2018. (*Id.*) Before the events underlying this lawsuit, he performed the essential functions of his job and was subject to no disciplinary action. (*Id.* at ¶ 89.)

On the afternoon of October 2, 2020, Kayla Diaz, the theater teacher at Ponderosa, emailed the staff to announce the upcoming production of *The Laramie Project*, a play about the hate crime murder of a gay college student in Laramie, Wyoming. (*Id.* at ¶¶ 9, 10.) Ms. Diaz wrote that students "have been working hard to learn about this story and represent it authentically and respectfully," and her email included a letter from a group of students who were "responsible for research, communication, and helping ensure that Ponderosa and our community understand why we chose the show and that our audiences are informed about the nature and topic of the show." (*See* ECF No. 19-2 at 1.) The student letter explained that the show "covers heavier topics" than previous productions but was not intended "to push any kind of agenda." (*Id.*) Ms. Diaz further explained as follows:

> Due to the language and content discussed in the show (there is no violence shown, only discussed) this is not a family-friendly show. We are advertising "For mature audiences" and I would generally recommend high school age and up. We will be reaching out more soon about advertising in the school, but it is important that I can answer any questions you may have and that you are aware of the nature of the play so that if we have students who have an aggressively adverse reaction to our show choice that you can support us in helping students understand. This is a play about perspectives, and we would not want anyone in the school to believe that we are making a statement against anything other than hate and violence.

(*Id.* at 2.)

That evening, Plaintiff responded in a reply-all email:

> Thanks Kayla. I appreciate the email and really do admire the hard work that you do. As a Dad of a student here and also as an employee in the school what is my recourse if I disagree with the production? Was this a heads up to see if everyone is cool?

(*Id.*)

Replies from other staff members, which were supportive of both the theater program and the production, followed. For example, one teacher responded, in part, as follows:

3

> Thank you so much for deciding to do a show that so closely connects to Ponderosa High School's core values of kindness, empathy, and respect. The connection to our anti-bullying program, "Dude, be nice," is incredible too. I can only imagine how impactful this show has been for your students and will be for all of our students. Truly, thank you so much for empowering students during this challenging time.

(*Id.*) Another responded:

> As history teacher I'm glad to hear that our students are engaging with important historical events across subject areas. I know that engaging with difficult subject matter can be difficult, but that is why it is important.

(*Id.* at 3.) Another staff member wrote:

> I am very impressed with the way your students presented themselves in their letter. You have obviously taught them to be respectful and mature. I look forward to the production. Thanks for being a positive influence on our students and community.

(*Id.* at 4.)

Following these messages, Plaintiff sent two more reply-all emails that evening, first writing:

> As a christian I would love to collaborate with your project. Please let me know if the love that Jesus can provide will help your play.

(*Id.*) Minutes later, he added:

> For the record, all of administration does not agree with me on this. I am totally solo. Goodnight Mustangs!

(*Id.* at 5.)

The next day, the email chain continued to grow as Ponderosa staff expressed support for the production. Plaintiff then sent a fourth email, stating:

> I understand people support this. Forgive me for having a different viewpoint and the audacity to publicly share it.

(*Id.* at 7.) Plaintiff's emails included his signature block identifying him as "Athletic Director/Assistant Principal." (*Id.* at 1, 2, 4, 5.)

4

Over the weekend, Defendant received multiple complaints from Ponderosa staff who perceived Plaintiff's emails as "bullying," "threatening," and "discriminatory toward the LGBTQ community." (ECF No. 97, ¶¶ 18, 19.) Due to the complaints, Danny Winsor, Defendant's Executive Director of Schools for the Parker Region and Plaintiff's supervisor, directed Plaintiff not to come to work on Monday. (*Id.* at ¶ 20.) In the days that followed, Defendant continued to receive complaints that Plaintiff "was demonstrating bigotry toward a marginalized group" and decided to open an investigation. (*Id.* at ¶ 21, 25.) Plaintiff was placed on paid leave, and Cathy Franklin, Defendant's Human Resources Director, began conducting the investigation. (*Id.* at ¶¶ 26, 27.)

The investigation involved reviewing Plaintiff's emails and the complaints that followed and interviewing twenty-five staff members, including Plaintiff and staff members who supported him. (*Id.* at ¶¶ 28-30, 31, 34, 44.) In addition to responding to Plaintiff's emails, staff members complained about other aspects of Plaintiff' job performance, saying that he was part of a "good ole boys club," that he made sexist and racist comments, and that he failed to follow and enforce mandatory COVID-19 guidance, specifically around masking. (*Id.* at ¶¶ 36-39.) As the investigation proceeded, Ms. Franklin and Mr. Winsor met with Plaintiff several times to provide him with updates. (*Id.* at ¶ 45.) Initially, Ms. Franklin and Mr. Winsor believed that Defendant should place Plaintiff on a performance improvement plan and require him to issue an apology. (*Id.* at ¶ 47, 48.) However, when Ms. Franklin, Mr. Winsor, and Plaintiff struggled to agree on how the apology should be worded, Ms. Franklin and Mr. Winsor became concerned that Plaintiff was unwilling to take responsibility for his actions. (*Id.* at ¶¶ 50-61.) Though Plaintiff eventually offered to sign the letter they drafted, Ms. Franklin and Mr. Winsor were

5

concerned the offer was not genuine and that Plaintiff was merely trying to save his job. (*Id.* at ¶¶ 63, 64.)

Three weeks after the email exchange, Ms. Franklin, Mr. Winsor, and other administrators, including Ted Knight, Defendant's Assistant Superintendent, met to discuss the investigation and the complaints against Plaintiff. (*Id.* at ¶¶ 70, 73.) Ms. Franklin, Mr. Winsor, and Mr. Knight are all Christians. (*Id.* at ¶¶ 3, 4, 27.) Mr. Knight, the ranking administrator at the meeting, made the decision that Plaintiff should be terminated. (*Id.* at ¶ 72.) Mr. Knight concluded the staff had lost trust in Plaintiff, making him an ineffective leader, and that students and staff perceived him as intolerant. (*Id.* at ¶ 75.)

Plaintiff's termination notice states that Defendant commenced its investigation in response to allegations Plaintiff had made discriminatory and unprofessional comments about the school play in his reply-all emails. (ECF No. 19-3 at 1.) The notice further states:

> During the course of the investigation, numerous Ponderosa staff came forward and expressed their displeasure with your comments because they believed your comments were unprofessional and displayed a discriminatory bias against staff and students who represent and/or support the LGBTQ community. Moreover, during the course of the investigation, Ponderosa staff asserted other allegations against you with respect to your conduct that were unrelated to the abovementioned email exchange. Ponderosa staff asserted that you had made sexist and racist comments in the past, had attempted to change student grades, failed to follow mandatory District safety practices with regard to COVID-19, and promoted . . . an educational environment that favored some students and staff over others.

(*Id.*) Upon review of the allegations, Defendant determined that "it is more likely than not that you engaged in the misconduct alleged by Ponderosa staff" and that "you cannot return to Ponderosa as a building leader given the level of disruption, distress and mistrust your conduct has engendered." (*Id.*)

Plaintiff filed this lawsuit in July 2022, asserting various discrimination and retaliation claims. After the Court dismissed the lawsuit for failure to state a claim, the United States Court

6

of Appeals for the Tenth Circuit affirmed the dismissal of Plaintiff's retaliation claims and reversed the dismissal of his discrimination claims.  *See McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122 (10th Cir. 2024).  On remand, Defendant now moves for summary judgment on the discrimination claims.

**III.    ANALYSIS**

Plaintiff brings religious discrimination claims under Title VII of the Civil Rights Act of 1964 and the Colorado Anti-Discrimination Act ("CADA").  (ECF No. 24, ¶¶ 119-125; 132-139.)  The same legal standards apply to both claims.  *See Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1107 n.2 (D. Colo. 2021).

Title VII prohibits an employer from discriminating against someone because of his religion.  *See* 42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove discrimination with either direct or circumstantial evidence.  *See Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).  "Direct evidence requires proof of an existing policy which itself constitutes discrimination or oral or written statements on the part of a defendant showing a discriminatory motivation."  *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 854-55 (10th Cir. 2007) (quotations and citations omitted).

When a plaintiff relies on circumstantial evidence, courts use the three-step framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to determine whether the evidence raises an inference of invidious discriminatory intent sufficient to survive summary judgment.  *See Adamson*, 514 F.3d at 1145.  First, the plaintiff must establish a prima face case of discrimination.  *Simmons v. Sykes Enters.*, 647 F.3d 943, 947 (10th Cir. 2011).  To establish a prima face case, a plaintiff must show that he belongs to a protected class, he suffered an adverse employment action, and the circumstances give rise to an inference of discrimination.

7

*Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021). Second, once the plaintiff makes this showing, the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for its action. *Simmons*, 647 F.3d at 947. Third, if the defendant proffers such reasons, the burden shifts back to the plaintiff to show they are pretextual. *Id.*

### A.      Direct Evidence

When this case was on appeal, the Tenth Circuit held that Plaintiff's Complaint did not show direct evidence of discrimination: "Based on the allegations, a factfinder still would need to infer [Defendant] investigated and terminated plaintiff for his religious *beliefs*, and not, for example, for making religious comments that might have violated [Defendant's] policies." *McNellis*, 116 F.4th at 1138. In his Response, Plaintiff argues that "with the benefit of discovery, the gap has been closed" because "Defendant expressly concedes that Mc Nellis's emails . . . did *not* violate any written policy." (ECF No. 94 at 4.)

But Defendant's concession that Plaintiff's emails did not violate any written policy simply rules out one plausible justification Defendant might have had for initiating its investigation. That does not mean there is direct evidence Plaintiff was investigated and then terminated because of his religious beliefs. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *McNellis*, 116 F.4th at 1137 (quotation omitted). Here, even though Plaintiff's emails did not violate any written policy, a factfinder still would need to infer Defendant's investigation and firing of Plaintiff was for no other legitimate reason, including the fact that numerous staff members complained that his reply-all emails were unprofessional and discriminatory toward the LGBTQ community. Although Plaintiff contends that he was told he was being investigated and placed on leave because of his "religious comments," such statements do not qualify as direct evidence.

8

"Statements that require the trier of fact to infer that discrimination was a motivating cause of an employment decision . . . are at most circumstantial evidence of discriminatory intent." *Id.* (quotation omitted); *see also Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) ("[I]f the content and context of a statement allow it to be plausibly interpreted in two different ways—one discriminatory and the other benign—the statement does not qualify as direct evidence."). Plaintiff has adduced no other evidence showing that Defendant relied on, or even considered, his religion in deciding to terminate him. Accordingly, on the current record, the Court discerns no direct evidence of discrimination.

      **B.**      **Prima Facie Case**

Defendant argues that Plaintiff cannot establish a prima facie case because he has not shown he was terminated under circumstances giving rise to an inference of religious discrimination. The Court agrees.

There is no dispute that Plaintiff's reply-all emails prompted the investigation that led to his termination. But even though the emails, collectively, refer to Plaintiff's Christian faith, that alone is not enough to give rise to an inference of religious discrimination. Context matters. In response to Ms. Diaz's initial email, which was intended to preempt adverse reactions (from students) to a play condemning hate and violence, Plaintiff, an administrator at Ponderosa, sent four reply-all emails indicating that he opposed the production. In light of the play's themes and Ms. Diaz's thoughtful explanation about why it was chosen, other staff members understandably perceived Plaintiff's comments as expressing intolerance against the LGBTQ community, prompting several of them to make complaints.

Defendant responded to those complaints by placing Plaintiff on paid leave and opening an investigation. Under the circumstances, the evidence supports Defendant's position that it

9

was concerned about the allegations of discrimination against Plaintiff and the effect his statements had on Ponderosa staff. Without more, the circumstances do not give rise to an inference that Defendant discriminated against Plaintiff because of his religious beliefs. There is no indication, for example, that Defendant would have ignored the complaints if the emails did not reference Plaintiff's religion. Nor has Plaintiff identified any other evidence of anti-Christian animus that might have driven its response to the complaints generated by his comments. Indeed, the three people most central to the investigation are Christian as well, further undermining any inference of religious discrimination. Therefore, the Court finds Plaintiff has failed to meet his burden of establishing a prima facie case of religious discrimination.

### C. Pretext

Even if Plaintiff could establish a prima facie case, he also has not shown that Defendant's stated reasons for investigating and then firing him are pretextual. The record is simply devoid of any statements demonstrating discriminatory animus or other evidence that Defendant intended to discriminate against Defendant because of his religion. Based on its investigation, Defendant determined that the way Plaintiff expressed his personal views created the impression that he was intolerant of the LGBTQ community and that this would undermine his ability to fulfill his role as an administrator at Ponderosa. Plaintiff has not provided any evidence that Defendant did not honestly believe this to be the case. "The relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (quotation omitted). Nor has Plaintiff shown that Defendant's stating reasons for firing him are too weak, implausible, inconsistent, incoherent, or contradictory to believe. His mere conjecture that Defendant's explanations are pretextual is

10

insufficient to survive summary judgment. *See id.* As a result, Defendant is entitled to summary judgment on Plaintiff's discrimination claims for the additional reason that he has not demonstrated a genuine issue with respect to whether Defendant's stated reasons for firing him are pretextual.

## IV. CONCLUSION

Defendant's Motion (ECF No. 82) is GRANTED, and the Clerk is directed to CLOSE this case.

DATED this 22nd day of December, 2025.

BY THE COURT:

_____
RAYMOND P. MOORE
Senior United States District Judge